UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ORIGINAL**

-------------------------------------- X

UNITED STATES OF AMERICA

           - v. -

JAMES DAVID WILLIAMS,
STEVEN BROWN, and
GERALD SEPPALA,

         Defendants.

-------------------------------------- X

**SEALED**
**INDICTMENT**

S3 16 Cr. 436

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

The Grand Jury charges:

### THE SCHEME TO DEFRAUD

1.  As set forth more fully below, from in or about 2012 through in or about June 2016, JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD SEPPALA, the defendants, participated in a fraudulent "advanced fee" scheme, in which WILLIAMS and BROWN portrayed themselves as experts in the marketing of feature-length films and documentaries and, along with SEPPALA, solicited investments in these films from investors by typically promising guaranteed returns and participation in the profits, which never materialized.

2.  In order to solicit these investments, JAMES DAVID WILLIAMS, STEVEN BROWN and GERALD SEPPALA, the defendants, made material misrepresentations about, among other things, their own investment in the films and/or funding that they claimed they

had already received from other investors, and used falsified financial documents to support their claims.

3. In total, JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD SEPPALA, the defendants, solicited more than $12 million from various investors to allegedly help finance the marketing or the production of different film projects. In reality, however, the money that was received from these investors was used to fund other projects, pay back other defrauded investors, or to pay the personal expenses of WILLIAMS, BROWN, and SEPPALA.

### The Defendants Defraud Victim-1

4. In or about April 2013, as part of the scheme to defraud, JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD SEPPALA, the defendants, approached an individual ("Victim-1") about the possibility of investing in a feature-length film.

5. In total, from in or about April 2013 through in or about January 2014, Victim-1 was fraudulently induced to provide approximately $11 million to JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD SEPPALA, the defendants, or to companies controlled by the defendants, to finance various film projects. In reality, however, most of the money provided by Victim-1 was not used for the purpose for which it was solicited, and was instead diverted for the personal use of WILLIAMS, BROWN, and SEPPALA.

2

6.     The means and methods by which JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD SEPPALA, the defendants, defrauded Victim-1 include, among other things, the following:

a.     In or about April 2013, WILLIAMS and SEPPALA were introduced to Victim-1 through a third party.  Following that introduction in or about April 2013, WILLIAMS and SEPPALA discussed the possibility of Victim-1 investing in a feature-length documentary ("Movie-1").  They explained to Victim-1 that BROWN and SEPPALA were the producers of Movie-1 and that a company managed by SEPPALA called Visions, LLC ("Visions") would serve as the primary production and financing vehicle for Movie-1.

b.     Victim-1 was offered the chance to invest $500,000 in Movie-1 by WILLIAMS and SEPPALA under terms that promised, among other things, that Victim-1 would be among a class of shareholders who would have the right to recoup their investment first and would also get a pro-rata share of the film's profits.  WILLIAMS and SEPPALA further falsely explained to Victim-1 that WILLIAMS would be investing $500,000 of his own money for an identical stake in Movie-1.

c.     On or about April 15, 2013, SEPPALA sent an email to Victim-1 attaching an email from WILLIAMS containing what appeared to be a confirmation of a wire transfer of $500,000

3

from a bank account controlled by WILLIAMS into a Visions bank account (the "Visions Account"). SEPPALA then forwarded a copy of that email to WILLIAMS and BROWN.

d.    Several days later, as further confirmation of WILLIAMS' investment, SEPPALA sent Victim-1's attorney via email what purported to be a screenshot of an online statement for the Visions Account, which showed a balance of approximately $531,610.12 as well as an acknowledgement, signed by SEPPALA, that VISIONS had already received WILLIAMS' $500,000. In addition, the next day, SEPPALA, copying WILLIAMS, sent Victim-1 a copy of an agreement, signed by WILLIAMS, confirming WILLIAMS' purchase of an identical stake in Movie-1.

e.    Relying in part on these representations, on or about April 26, 2013, Victim-1 directed an employee to wire $500,000 to the Visions Account.

f.    In or about June 2013, WILLIAMS approached Victim-1 with an opportunity to invest in another feature-length film ("Movie-2"). Specifically, WILLIAMS represented that he had an agreement with the producer of Movie-2 for WILLIAMS to make a $10 million loan for the marketing of the film.  Once again, the loan would be repaid out of net revenues prior to the repayment of other investors and holders of the loan would be given a share of the films net profits.

4

g.     WILLIAMS told Victim-1 that his company, Luxe One, would be making the loan and that WILLIAMS had already transferred $2 million of his own money to Luxe One in order to personally participate in the investment.

h.     In addition, WILLIAMS told Victim-1 that he had already secured an additional $6 million from a company called Chart Investment Fund ("Chart") which was a collection of individuals with whom WILLIAMS claimed that he had made such investments in the past.  WILLIAMS asked Victim-1 to invest the remaining $2 million in Movie-2.

i.     Based in part on these representations, in or about July 3, 2013, Victim-1 directed an employee to transfer $2 million to an account for Luxe One (the "Luxe One Account-1").

j.     In or about September 2013, WILLIAMS approached Victim-1 with an opportunity to invest in the marketing of a third movie ("Movie-3").  WILLIAMS represented to Victim-1 that WILLIAMS had negotiated to make a $4 million loan for the marketing expenses of Movie-3.  WILLIAMS and counsel for Victim-1 agreed that a company, incorporated by WILLIAMS, called Moment Factory, LLC ("Moment Factory") would be the relevant entity to which Victim-1 should send Victim-1's investment.  WILLIAMS further falsely told Victim-1 that WILLIAMS had already

5

transferred $2 million of his own money to Moment Factory and sought the remaining $2 million from Victim-1.

k.    Prior to sending funds to Moment Factory, Victim-1 asked for confirmation that WILLIAMS had already contributed the $2 million to Movie-3.  In response, WILLIAMS emailed Victim-1 what purported to be a screenshot of the Moment Factory bank account (the "Moment Factory Account") statement (the "Moment Factory Account Statement").  According to the Moment Factory Account Statement, as of October 28, 2013, the Moment Factory Account had a balance of $1,903,150.24, which allegedly represented what remained from WILLIAMS $2 million investment.

l.    Based in part on these representations, on or about October 30, 2013, Victim-1 directed an employee to transfer $2 million to the Moment Factory Account.

m.    In or about November 2013, WILLIAMS approached Victim-1 with an opportunity to invest additional money in Movie-2 through Luxe One.  WILLIAMS explained that the company producing Movie-2 (the "Company") was looking to increase the investment to $22 million in the marketing expenses for Movie-2 and an additional $1.75 million in "finishing funds" for Movie-2.  WILLIAMS told Victim-1 that WILLIAMS needed an additional $12 million to complete the deal and that WILLIAMS, through his company, was investing an additional $4 million, and that Chart

6

was doing the same. WILLIAMS asked Victim-1 to contribute the remaining $4 million.

n.    Prior to investing additional money in Movie-2 through Luxe One, Victim-1's attorney asked WILLIAMS to confirm that WILLIAMS and Chart had each already transferred their $4 million respectively; that a total of $18 million had already had been collected; and that the so-called "finishing funds" had already been paid.  In response, WILLIAMS sent Victim-1's counsel in Manhattan a screenshot of what purported to be a statement from the Luxe One Account-1 (the "Luxe One Account-1 Statement").  The Luxe One Account-1 Statement showed that, as of December 17, 2013, the Luxe One Account-1 had a balance of $18,014,609.46. A few days later, WILLIAMS sent Victim-1's counsel copies of what purported to be cancelled checks from the Luxe One Account-1 representing the $1.75 million in so-called "finishing funds" that Luxe One paid to the Company.

o.    Based in part on these representations, on or about January 2, 2014, Victim-1 directed an employee to transfer an additional $4 million to the Luxe One Account-1.

p.    Throughout the winter and spring of 2014, Victim-1, through counsel and through Victim-1's accountant, continually requested additional information on Luxe One and Moment Factory. In partial response to this request, an employee

7

of WILLIAMS sent what purported to be financial statements for Luxe One Account-1 from June 2013 through December 2013 (the "Luxe One Financial Statements"). The Luxe One Financial Statements reflected, among other things, a different balance in the Luxe One Account-1 on December 17, 2013, than that which was reflected in the Luxe One Account-1 Statement that WILLIAMS sent to Victim-1's counsel on or about December 18, 2013. In addition, the Luxe One Financial Statements did not accurately reflect the "finishing funds" payments that WILLIAMS represented to Victim-1 that WILLIAMS had made. Based in part on these discrepancies, Victim-1 asked WILLIAMS and BROWN to return Victim-1's investment. Despite numerous conversations with BROWN on the topic, neither BROWN nor WILLIAMS returned Victim-1's money.

7.     True and accurate records obtained directly from the banks where the Visions Account, the Luxe One Account-1 and the Moment Factory Account are each held confirm that JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD SEPPALA, the defendants, made material representations to Victim-1 and had falsified business records in order to induce Victim-1 to invest in various movies. For example:

a.     The Visions Account was opened just a couple of weeks prior to Victim-1's transfer; the Visions Account did not

8

have any money in it prior to Victim-1's transfer of $500,000;
and there had been no wire transfer into that account from
anyone other than Victim-1.

      b.   There was no money in the Moment Factory Account
on the date that WILLIAMS sent Victim-1 the Moment Factory
Account Statement reflecting a balance of approximately $1.9
million and, indeed, that account never held any funds until
Victim-1 transferred $2 million into the Moment Factory Account.

      c.   Neither WILLIAMS nor Chart had invested any of
their own money into the Luxe One Account-1 prior to Victim-1's
transfer of $4 million to that account on January 2, 2014; on
December 17, 2013, the actual balance of the Luxe One Account-1
was approximately $112,945.09; and as of January 2, 2014, there
was no record of the $1.5 million check, a copy of which
WILLIAMS had sent to Victim-1 in December 2013, that WILLIAMS
claimed had been sent to the Company as "finishing funds."

The Defendants Defraud Victim-2

    8.   In or about April 2014, as part of the scheme to
defraud, JAMES DAVID WILLIAMS and STEVEN BROWN, the defendants,
approached another individual ("Victim-2") about the possibility
of investing in a feature-length film ("Movie-4").  Victim-2
agreed to invest $500,000 in the production of Movie-4 based on
misrepresentations as to how that money would be used.  As set

9

forth below, none of the money provided by Victim-2 was used for the purpose for which it was solicited, and was instead diverted for the personal use of WILLIAMS.

9.    The means and methods by which JAMES DAVID WILLIAMS and STEVEN BROWN, the defendants, defrauded Victim-2 include, among other things, the following:

a.    In or around April 2014, BROWN was introduced to Victim-2.  BROWN explained to Victim-2 that BROWN and WILLIAMS were the producers of Movie-4, which had a total budget of between $2.5 million and $4 million. Initially BROWN asked Victim-2 for a $2 million investment.

b.    In or around September 2014, Victim-2 met with BROWN and WILLIAMS (the "September Meeting") to discuss the investment.  During that meeting, WILLIAMS explained to Victim-2 that WILLIAMS had already invested $3 million of his own money in Movie-4 and BROWN had invested $500,000 in Movie-4 as well, for a total of $3.5 million.  WILLIAMS and BROWN proposed that Victim-2 provide $500,000 which would be fully guaranteed by a company called Woodlawn Holdings ("Woodlawn").  Victim-2 would be required to keep the money in the film for at least six months, then, within 120 days of the end of the sixth month, Victim-2 was eligible to exercise the guarantee with Woodlawn and be repaid the $500,000 plus an additional 15%.

10

c.   WILLIAMS and BROWN falsely told Victim-2 in or about September 2014 that, even if Victim-2 exercised the guarantee with Woodlawn, Victim-2 would still receive 2.5% of the film's profits. WILLIAMS indicated that Victim-2's investment should  be sent to Plainfield Pass, LLC ("Plainfield Pass"), the company responsible for producing Movie-4, by transferring it to a particular bank account (the "Plainfield Account").

d.   WILLIAMS further told Victim-2 that production on Movie-4 was scheduled to be completed in four months.

e.   Prior to investing, Victim-2, through counsel, asked BROWN and WILLIAMS to provide additional information on Plainfield Pass and Woodlawn and to confirm that the $3.5 million had already been received.  In response, WILLIAMS, copying BROWN, sent an email to Victim-2, attaching what purported to be a screenshot of the most current statement from the Plainfield Account (the "Plainfield Account Statement").

f.   In addition, BROWN sent an email to Victim-2 attaching what purported to be a current bank statement from the relevant account (the "Woodlawn Account") at Woodlawn (the "Woodlawn Account Statement") as well as an email that purported to come from a "Managing Member" of Woodlawn ("Individual-1"), guaranteeing Victim-2's investment.  The Plainfield Account

11

Statement reflected a current balance of $3,500,200.07 in the Plainfield Account, while the Woodlawn Account Statement showed that the Woodlawn Account had more than $4 million in it.

      g.   Based in part on these representations, on or about September 12, 2014, Victim-2 wired $500,000 to the Plainfield Account.

      h.   In or about May 2015, Movie-4 still had not been made yet and so Victim-2 contacted BROWN and asked BROWN to account for Victim-2's funds.  When BROWN told Victim-2 that Victim-2's money was now being used for a different movie, Victim-2 exercised the guarantee through Woodlawn for the return of the funds plus interest.

      i.   After not being paid for several months, Victim-2 contacted Woodlawn to inquire about the status of the guarantee. A representative of Woodlawn told Victim-2 that Woodlawn had no knowledge of BROWN, WILLIAMS, Plainfield Pass or Individual-1.

    10.  True and accurate records obtained directly from the banks where the Plainfield Account and the Woodlawn Account are each held confirm that JAMES DAVID WILLIAMS and STEVEN BROWN, the defendants, made material representations to Victim-2 and had falsified business records in order to induce Victim-2 to invest in Movie-4.  For example:

a. The Plainfield Account only had a balance of $500,200 at the time that Victim-2 transferred the $500,000 into the Plainfield Account.

b. The Woodlawn Account never had $4 million in it and, in fact, it appears no such account exists at the bank indicated on the Woodlawn Account Statement.

## The Defendants Defraud Victim-3

11. In or about the Spring of 2014, as part of the scheme to defraud, GERALD SEPPALA, the defendant, approached another individual ("Victim-3") about the possibility of investing in Movie-2.

12. As set forth below, none of the money provided by Victim-3 was used for the purpose for which it was solicited, and was instead diverted for the personal use of JAMES DAVID WILLIAMS and GERALD SEPPALA, the defendants.

13. The means and methods by which JAMES DAVID WILLIAMS and GERALD SEPPALA, the defendants, defrauded Victim-3 include, among other things, the following:

a. SEPPALA falsely told Victim-3 that SEPPALA and his partners had raised $13.5 million for Movie-2 and just wanted to raise another $500,000. SEPPALA falsely told Victim-3 that Victim-3 would be paid back, along with 18% interest, within a few months of Movie-2's release in September 2014.

13

b.    Victim-3 agreed to loan $100,000 to help finance Movie-2 with the assurance of that the money would be used for the sole purpose of covering the distribution costs associated with Movie-2.  SEPPALA told Victim-3 to deposit the money into an account for Luxe One (the "Luxe One Account-2") that SEPPALA told Victim-3 was the vehicle for financing the distribution costs of Movie-2.

c.    Based in part on these representations, on or about July 16, 2014, Victim-3 transferred $100,000 into the Luxe One Account-2.

d.    Victim-3 did not receive any money in connection with Victim-3's investment in Movie-2 for almost a year.  In or about the summer of 2015, Victim-3 asked WILLIAMS and SEPPALA to get Victim-3's money back.  In negotiations that lasted into the fall of 2015, SEPPALA and WILLIAMS continued to tell Victim-3 that they were trying to find another investor to buy out Victim-3's loan.  Despite these negotiations, as of at least December 2015 Victim-3 still had not received any money back.

14.   True and accurate records from the bank where the Luxe One Account-2 was held show that JAMES DAVID WILLIAMS and GERALD SEPPALA, the defendants, made material representations to Victim-3 in order to induce Victim-3 to invest in Movie-2.  For example:

14

a.   The only two deposits greater than $1,000 into the Luxe One Account-2 were Victim-3's investment of $100,000 and an additional $100,000 deposited by an acquaintance of Victim-3 who had agreed with SEPPALA to loan money to Movie-2 under similar terms to those offered to Victim-3.

b.   In addition, by in or about May 2015, an agreement between Luxe One and the Company concerning the rights to Movie-2 was terminated.  Accordingly, at the time that SEPPALA and WILLIAMS were telling Victim-3 that they would be able to find other investors to buy Victim-3 out of the investment, SEPPALA and WILLIAMS actually had no connection with Movie-2 and no ability to find additional investors or to repay Victim-3 with proceeds of Movie-2.

The Diversion of Fraudulently Obtained Funds by the Defendants

15.   During the course of the conspiracy, JAMES DAVID WILLIAMS, STEVEN BROWN and GERALD SEPPALA, the defendants, repeatedly diverted the fraudulently obtained funds to their own personal use and to further perpetuate the scheme.  For example:

a.   In or about 2012, WILLIAMS and BROWN solicited $75,000 from another individual ("Victim-4") for the promotion of a feature-length film ("Movie-5").  BROWN falsely told Victim-4 that BROWN had invested an identical sum and that Victim-4 would be paid back within one year at five percent

15

interest.  Victim-4 agreed and, at BROWN's direction, deposited Victim-4's investment into an account for a company called Highgate Pass (the "Highgate Pass Account").  Records from the Highgate Pass Account, however, revealed that (1) BROWN never invested any of his own money in the Highgate Pass Account; (2) on or about March 15, 2012, the day after Victim-4 deposited Victim-4's investment, WILLIAMS wired $35,000 of that money into an account controlled by BROWN and $10,000 of Victim-4's investment into an account controlled by SEPPALA.

      b.    Later, Victim-4 threatened to bring a lawsuit against WILLIAMS and BROWN to recover the fraudulently obtained funds, hiring a law firm (the "Law Firm") to represent Victim-4 in the matter.

      c.    On or about January 3, 2014, the day after Victim-1 deposited $4 million into the Luxe One Account-1, WILLIAMS wired $25,000 from the Luxe One Account-1 to the account of another company controlled by WILLIAMS called Legacy Filmcrest, LLC (the "Legacy Filmcrest Account").  In addition, on three dates thereafter, $12,500 was transferred from the Luxe One Account-1 to an account for the Law Firm (the "Law Firm Account").  In addition, on or about January 6, 2014, another $12,500 was wired from the Legacy Filmcrest Account to the Law Firm Account.  Finally, on or about May 28, 2014 and June 10,

16

2014, within weeks of Victim-3's acquaintance's deposit of
$100,000 into the Luxe One Account-2, two payments of $12,500
were sent from the Luxe One Account-2 to the Law Firm Account,
thereby completing the repayment of Victim-4.

16. The fraudulently obtained funds were also sometimes
diverted to the personal use of JAMES DAVID WILLIAMS and STEVEN
BROWN, the defendants. For example:

a. Within three days of Victim-2 depositing $500,000
into the Plainfield Account, almost $1 million were wired out of
the Plainfield Account and subsequently used by WILLIAMS to
purchase a home in Calabasas, California.

b. In addition, on several occasions, shortly after
deposits into the Luxe One-1 Account by Victim-1, WILLIAMS
transferred money out of the Luxe One-1 Account into another
account on which BROWN and WILLIAMS were signatories (the "Joint
Account"). Subsequent to these transfers BROWN disbursed money
from the Joint Account to different parties unrelated to the
film projects for which that money was given, including sending
more than $200,000 to a law firm with whom BROWN works and
$25,000 to BROWN'S wife.

c. Shortly after Victim-3 deposited money into the
Luxe One Account-2, $113,000 was transferred out of the Luxe One
Account-2 into the Highgate Pass Account, controlled by

17

WILLIAMS.  The money remaining in the Luxe One Account-2 was primarily spent on WILLIAMS' personal expenses including at restaurants, at retail stores and for a timeshare used by WILLIAMS.

d.   The $113,000 that was transferred to Highgate Pass Account was likewise spent on WILLIAMS' personal expenses including, among other things, clothing stores, club memberships and school tuition for WILLIAMS' children.

17.   JAMES DAVID WILLIAMS and STEVEN BROWN, the defendants, engaged in numerous monetary transactions which exceeded $10,000 using criminally derived proceeds from the above described fraud.  For example:

a.   As described in paragraph 16(a), WILLIAMS transferred almost $1 million, $500,000 of which was obtained from Victim-2, to purchase a house.

b.   On or about July 8, 2013, just a couple of days after Victim-1, deposited $2 million into the Luxe One Account-1, WILLIAMS transferred $100,000 of that sum to the Legacy Filmcrest Account.  Thereafter, on or about July 10, 2016, WILLIAMS sent approximately $47,145 from the Legacy Filmcrest Account to a car dealership for the purchase of a new car.

c.   As described in paragraph 16(b) above, shortly after WILLIAMS transferred Victim-1's money into the Joint

18

Account, in or about January 2014, BROWN sent two transfers,
both exceeding $10,000, to a law firm with which BROWN works and
an additional $25,000 to BROWN's wife.

### STATUTORY ALLEGATIONS

18.   From at least in or about 2012, up to and including in
or about June 2016, in the Southern District of New York and
elsewhere, JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD
SEPPALA, the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree
together to commit wire fraud in violation of Title 18, United
States Code, Section 1343, to wit, WILLIAMS, BROWN and SEPPALA
fraudulently induced individuals to invest in production and
marketing of feature-length films by, among other things,
promising the individuals guaranteed returns and profits, and
misrepresenting the amount of funding their co-conspirators and
other investors had already contributed to the film projects.

19.   It was a part and an object of the conspiracy that
JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD SEPPALA, the
defendants, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, would and did transmit and cause to be transmitted by

19

means of wire and radio communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the
purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

20.  The allegations contained in paragraphs 1 through 17
above are hereby repeated, realleged, and incorporated by
reference as if fully set forth herein.

21.  From at least in or about 2012, up to and including in
or about June 2016, in the Southern District of New York and
elsewhere, JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD
SEPPALA, the defendants, willfully and knowingly, having devised
and intending to devise a scheme and artifice to defraud, and
for obtaining money and property by means of false and
fraudulent pretenses, representations, and promises, and
attempting to do so, did transmit and cause to be transmitted by
means of wire, radio, and television communication in interstate
and foreign commerce, writings, signs, signals, pictures, and
sounds for the purpose of executing such scheme and artifice, to
wit, WILLIAMS, BROWN, and SEPPALA participated in a scheme to

20

fraudulently induce individuals to invest in the production and marketing of feature-length films by, among other things, promising the individuals guaranteed returns and profits, and misrepresenting the amount of funding they and other investors had already contributed to the film projects, and in connection therewith and in furtherance thereof, WILLIAMS, BROWN, and SEPPALA transmitted or caused to be transmitted interstate electronic mail, telephone calls, and wire transfers of funds.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

22.   The allegations contained in paragraphs 1 through 17 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

23.   From at least in or about 2012, up to and including December 2014, in the Southern District of New York and elsewhere, JAMES DAVID WILLIAMS and STEVEN BROWN, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1957(a), to wit, WILLIAMS and BROWN used fraudulently

obtained financing for movie projects to, among other things, pay for their own personal expenses.

24.  It was a part and an object of the conspiracy that JAMES DAVID WILLIAMS and STEVEN BROWN, the defendants, and others known and unknown, in an offense that took place in the United States, knowingly engaged and attempted to engage in monetary transactions in criminally derived property that was derived from a specified unlawful activity, to wit, the wire fraud charged in Counts One and Two of this Indictment, of a value greater than $10,000.

(Title 18, United States Code, Section 1956(h).)

### FIRST FORFEITURE ALLEGATION

25.  As a result of committing of the offenses alleged in Counts One and Two, JAMES DAVID WILLIAMS, STEVEN BROWN, and GERALD SEPPALA, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any and all property, real or personal, constituting, or derived from, proceeds traceable to a violation of the offenses, including but not limited to a sum of United States currency representing the amount of proceeds obtained as a result of the offense.

22

## SECOND FORFEITURE ALLEGATION

26.  As a result of committing of the offenses alleged in Count Three, JAMES DAVID WILLIAMS and STEVEN BROWN, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any and all property, real or personal,  constituting, or derived from, proceeds traceable to a violation of the offense, including but not limited to a sum of United States currency representing the amount of proceeds obtained as a result of the offense.

### Substitute Asset Provision

27.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

> (1) cannot be located upon the exercise of due diligence;
>
> (2) has been transferred or sold to, or deposited with, a third person;
>
> (3) has been placed beyond the jurisdiction of the Court;
>
> (4) has been substantially diminished in value;

or

> (5) has been commingled with other property

which cannot be subdivided without difficulty; it is the intent

23

of the United States, pursuant to 18 U.S.C. § 981, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c) to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 1343, 1349, and 1956;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461(c).)

FOREPERSON

PREET BHARARA
United States Attorney

24

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**v.**

**JAMES DAVID WILLIAMS,**
**STEVEN BROWN, and**
**GERALD SEPPALA,**

                    **Defendants.**

---

**SEALED SUPERSEDING**
**INDICTMENT**

(18 U.S.C. §§ 1343, 1349, 1956(h) and
2.)

---

PREET BHARARA
United States Attorney.

A TRUE BILL

                                    Foreperson.

---